This case, which was originally instituted against the deceased’s executor alone, was before this court, in June term, 1819 and remanded. Ou its return to the parish court, the heirs were made parties. G Martin, 7-31.
They pleaded the insanity of the testator, and consequent nullity of the will ; that neither the plaintiff, nor her child, could receive any thing under a will ; nor could she, being a slave, maintain any action, except against such persons as unlawfully detained, and deprived her of her liberty ; that the clauses of the said will invoked by the plaintiff, are contrary to law and void. They prayed that the cause might be tried by a jury.
The following issue was submitted to the jury, by the defendant: E. R. Avart, was not of sound mind, at the time of making and signing the last will and testament, upon which this action is brought.
The plaintiff’s counsel objected thereto, urging that under the Civil Code 80, art. 17, such proof is inadmissible. The parish court *513 overruled the objection and he took a bill of exceptions.
The jury found the issue for the defendants.
A new trial was moved for on the affidavit of the plaintiff’s counsel, stating the discovery of new and material evidence, not in his knowledge before, viz : that Cherbonnier went to see the testator about the time, and after he made his will, remained with him a considerable time, and he believes he was during the whole time of perfect, sound mind. Risteau was present, when A. Choppin, one of the heirs, came to the testator’s house (after he had given himself the stroke with a sword, which occasioned his death, and before he made his will) and took out from a desk a check which he, Choppin, had given to Avart the day before, to purchase and emancipate the plaintiff.
The new trial was refused, and the plaintiff appealed.
The will is an authentic one and has the following clause : Erasmus R. Avart, residing in this city, in Conti-street, has been found, by the said notary and witnesses, lying on his bed, sick of body, but of sound mind, memory and understanding, as it appeared to the said notary and witnes *514 ses. Among other dispositions, the testator acknowledges for his natural child, Gaston, the son of the plaintiff, a mulatto woman, belonging to Nicholas Lauve, bequeathes freedom to her and the usufruct during her life of two houses and the lot of ground on which they stand, with a sum of money ; and to the said Gaston, at the death of his mother, the property of the said houses and lot, burdened with the usufruct. He made several other legacies and concluded by instituting for his heirs, by equal shares, his brothers and sisters, and appointing his brother Robert Avart, his executor. The will terminates by the following clause : it is thus, that this last will has been dictated by the testator to the notary, who has written the same as it has been dictated ; and the said notary, having read this said will to the testator, he has declared to understand and comprehend well the same, and to persevere therein ; the whole in the presence of the said witnesses.
There were two exceptions to the admission of the testimony, introduced in this case.
1. The first is grounded on the statute providing that, after the death of a person, the validity of acts done by him or her, cannot be contested for cause of insanity, unless the interdiction was pronounced or petitioned for, previous to the *515 death of such person. Civil Code, 80, art. 46.
It was necessary before the defendants should have been permitted to contest the will, for cause of insanity, that they should have shewn that an interdiction had been pronounced or petitioned for, previous to the testator’s death.
This article of the code cited is a legislative innovation. No doubt that, according to the Spanish law, before the promulgation of our code, a will could be contested for cause of insanity, though there was no interdiction pronounced or petitioned for, against the testator ; but this article changes the legislation, and forbids, in the most express, clear and energetic terms, that after the death of a person, the acts done by him be contested, for cause of insanity, unless an interdiction has been pronounced or petitioned for, previous to his death.
But, perhaps, it will be said that it relates only to the ordinary acts of life, and cannot be applied to donations and testaments ; but, it is indefinite, and embraces all kinds of acts, without any distinction, and where the law makes no distinction, the court cannot make any ; and our law has provided that, when a law is clear and free from all ambiguity, the letter of it is not to be disregarded, under the pretext of pursuing its spirit. Civil Code, 5, art. 13.
*516 That, in France some courts of justice have decided that this disposition does not apply to donations and testaments, and others quite the reverse, cannot be denied ; but in that country, a greater latitude is allowed to the judges than in ours, where we are the slaves of the laws, in order that we may be free.
Our code speaks of all acts without exception. The only question which remains for us to examine is, whether the framers of it, our legislators, to whom we had delegated the power of prescribing the rules of our civil conduct, with the solemn obligation on our part, to submit to such rules, have considered testaments and donations, as acts. This examination, they have taken the trouble to facilitate to us, by declaring that a donation inter vivos is an act by which, &c. Id. 208, art. 2. A donation mortis causa is an act by which, &c. id. art. 3. A testament is the act, &c. id. 226 art. 82.
After this, can any doubt remain ? Will our supreme court permit themselves to be guided by the interpretation, or the application that some of the French jurists and tribunals have *517 adopted, as to the corresponding article in the Code Napoleon ? No, they will say as heretofore; " with whatever deference and respect, we may view the opinions of the authors cited (French judges and jurists) we are not certainly bound to adopt them. As the article of our code is indefinite, and does not distinguish and limit the species intended to be embraced by it, courts of justice cannot make any distinction.” Turpin vs. his creditors. 7 Martin, 53.
The only answer they will make to the defendants is, sero accusatis mores quos probavistis.
2. The second exception, not less founded in law, is that the evidence is inadmissible, indepently of the article of the code cited.
According to the Spanish law, not repealed in this particular, an insane person may make a will, during a lucid interval.
An insane person cannot make a will, whilst he is so. Part. 6, 1, 13.
It is forbidden to make a will to a person who is out of his memory, desmemoriado, by which name the law of the Partidas, means a mad person or non compos mentis. Sala, illustracion del derecho real de España, lib. 2, tit. 4, de los testamentos, n. 9.
An insane person, and a person out of his me *518 mory, as long as they continue so, cannot make a will: but the will which they make before the madness or insanity is valid, as also the will which a madman makes during his lucid interval, if he concludes it within the lucid in erval ; for if before the will is terminated, the fit of madness returns, the will will not be valid. Febrero, contratos 1, 1, § 6, n. 20.
*519 But in this respect, the Spanish law differs from the French, which I beg the court to attend to : as this difference serves to account for the inapplicability of many French doctrines and rules of proceedings, to the present case.
In France, from the very instant madness has made its appearance in an individual, he is to be considered always as mad : Semel furiosus, semper furiosus presumitur, and he is thereby rendered absolutely incapable of making a will, at any time afterwards, though he should have the most evident and longest lucid intervals.
Besides, says Merlin, it is very difficult, in France, to admit the circumstance of lucid intervals. They have felt there the inconveniencies of the Roman law, or rather of the interpretation that has been attempted to be given to it. All would be doubtful and arbitrary; the condition of men must be more certain. It is true, that old practitioners, who thought they had done much, when they had translated a Roman law into French, have said that the Roman law contained an exception, in favour of those intervals. But Mornac has judged of that law more correctly than them, when he said : " we hold, from the decisions of the courts, that the testament made by a testator who has lucid in *520 tervals is null." And in fact, no judgment of a court can be cited which has admitted and authorised the distinction of intervals, in order to support a testament, made since the commencement of the insanity. Repert. de jurisp. vo. Testament.
According to the Spanish, which is our law it this case, Erasmus R. Avart, could then make his will, during a lucid interval, and though he may have been mad before and after the making of the will, if it has been made during a lucid interval, it must be maintained.
If the notary, who has received the will of Avart, knew his professional duties and has complied with them, which must be taken for granted, till the contrary is proved, nobody else but the notary, the three witnesses to the will and the testator were in the room at the time of making and signing it.
Febrero, speaking of the manner in which the notary is to receive a last will, says : “ no body must know what it (the testament) contains, if it is an open one, till the moment of its being read to and approved of by the testator, at which time none else must be present, but the witnesses. 1 Contratos, 1, 1, § 20, n, 273.
In the same number, he gives the reasons why nobody else, but the witnesses, should be *521 present : in order to avoid, by this means, all kind of suggestion, particularly it he (the testator) is sick, and that he may be at liberty to explain what his wishes are and to discharge his conscience ; because experience has taught that, when that is not complied with, testators make dispositions forced, repugnant and hurtful, which serve only to create discord and law suits.
Now, by whom is it intended to prove that Erasmus R. Avart was not in a lucid interval (supposing that he has ever been insane) when he made his will ? It must be either by persons who were not present, at the making of the will, or by the notary and the three witnesses, who were present.
I say that this proof cannot be made by the former, not only because not being present they cannot say that it was not in a lucid interval that the will was received ; but, because, in the will, there is the attestation of the notary and the three subscribing witnesses (who were, by the by, the only competent judges of the mind of the testator, at the time he made his will) that he appeared, at that time, of sound mind, memory and understanding, and as the attestation was signed after the will was dictated by the testator, written and read to him, by the nota *523 ry, it follows that he appeared so to the witnesses from the beginning to the end ; which is evidence of a lucid interval. We have then in the testament a written proof of the sanity of the testator at the time, against which no oral testimony can be admitted. Contra scriptum testimonium. non scriptum testimonium non fertur, is a maxim of the civil law which receives exception but in few cases, of which the present is not one. But, supposing that the law should not prohibit oral testimony to be received in a case like this, of what weight can be the deposition of witnesses, on the lucid interval during which Erasmus R. Avart is said to have made his will, when they were not present ? Let one hundred witnesses declare that the testator was as insane as a man could be, before and after he made his will, does it necessarily follow that the will was not made during a lucid interval ? The notary and witnesses affirm that it was; the other witnesses can only deny it: and, in this case, it is a principle of law that more credit is to be given to two witnesses who assert an affirmative, than even to ten who deny it.
Castillo, in his work entitled, Quotidianarum controversiarum juris opus, gives a full treatise de conjecturis et interpretatione ultimarum votuntatum (chapter 28) and observes “ that the *524 proof by two witnesses, that a person was of sound mind, at the time of making an act, has the preference over the proof by many that he was insane before. More credit is given to witnesses who depose that a person is of sound mind, than to those who depose the contrary, and it is alike as to sanity and madness ; because witnesses, who depose in favor of sanity, depose of a quality which naturally exists in every body ; therefore, they are preferred to the others who depose of the insanity. Two witnesses who depose that a man was of sound mind, deserve more to be believed than one thousand, who should attest that he was road or insane.
Therefore, according to law, to reason and to the very nature of things, the court below ought not to have admitted witnesses, who were not present at the making of the will, in order to prove that it was not made during a lucid interval.
Let us examine now whether the notary and the witnesses, who have received the will, are competent witnesses in the present case.
Febrero observes, “ that in order to have the testament of a mad person, who has lucid intervals declared null, it is necessary to prove in a clear and convincing manner (this is the translation *525 of the word concluyentemente, given by New-man, in his much esteemed dictionary of the Spanish and English languages, London, 1817) by the notary and subscribing witnesses that, at the time of making his will, the testator was mad and had no such lucid interval. 1 Contratos, 1, 1, § 1, n. 10.
The wisdom of this doctrine, founded on the nature of things, which considers the notary and the subscribing witnesses as the only persons fit to depose upon a transaction, at which they alone were present, is of the highest evidence. But is it general, that is to say, are the notary and subscribing witnesses to be heard, in every case ? Is it not modified and restrained by any other disposition of the law ?
There is a maxim, in regard to the interpretation, which judges and jurists ought never lose sight of, and that is, that laws are to be taken together, and interpreted the one by the other : Incivile est, nisi tota lege perspecta, una aliqua partícula ejus proposita, judicare, vel respondere. L. 24. ff.de leg.
When a witness contradicts himself, in what he says, his testimony shall not be valid. Part. 3, 16, 41.
When a person, without being put under his oath, relates a fact extrajudicially, and afte *526 rwards being interrogated judicially, contradicts himself, it is in the discretion of the judge to believe, or not, his judicial deposition. 3 Covarrubias, 302.
Let it be permitted to me, to make here, by the bye, an observation which I consider as being important. In Spain, the judges are in general obliged to decide conformably to the testimony submitted to them ; they may be sued, when they do not decide according to the testimony ; but here, in every case, a certain latitude is left to our courts of justice, to appreciate the credit which is due to the witness.
Let us return to Covarrubias. He contines : if a witness extrajudicially affirm something under oath, and afterwards depose the contrary in court, neither of his testimonies ought to have any force.
The person who has given testimony in a suit which has been declared irregular and null, and afterwards says the contrary, before the legitimate judge, deserves no credit.
So it is, when a person has previously said something, though not under oath, but under his signature or seal : because then credit ought rather to be given to his first declaration (that under his signature or seal) than to the second given in court. Id. loco citato.
*527 This doctrine rests upon considerations of morality and justice, the wisdom of which cannot certainly be disputed. Truth is one ; it is the same at all times, and in all places. If, in order to administer justice, it be necessary to know the truth, can one flatter himself to know it, when, like a cameleon, it will, according to time and place, put on different colours and present itself under different forms.
True it is, that in countries, where the common law prevails, it is held that, except in regard to a negociable paper, a witness can be beard to contradict what he has said or written before. But, sound morality reproves such a doctrine and happily for us we live under a system of law, which rejects entirely such a monstrous doctrine.
In those countries, we have seen great men, of superior genius, oppose this doctrine with energy ; but the current of authorities and the strength of habit got the better of them. Let us listen to lord Mansfield, one of the most celebrated jurists of England, who had made a particular study of the civil law, of which he was an admirer and zealous partisan. In the opinion he gave in Walton vs. Shelley, 3, Durnford & East, he observed “ the old cases, upon the competency of witnesses, have *528 gone upon very subtle grounds ; but, of late years, the courts have endeavored, as far as possible, consistent with those authorities, to let the objection go to the credit, rather than to the competency, of a witness. What strikes me is the rule of law founded on public policy, which I take to be this : that no party who has signed a paper or deed shall ever be permitted to give testimony to invalidate that instrument which he has so signed. And there is sound reason for it ; because every man, who is a party to an instrument, gives a credit to it. It is of consequence to mankind that no person should hang out false colours to deceive others ; by first affixing his signature to a paper, and then afterwards giving testimony to invalidate it. The civil law says, nemo allegans suam turpitudinem est audiendus.”
Judge Lyons, of the supreme court of appeals of Virginia, in Baring vs. Reeder, speaking of the dangerous consequences which result from permitting a man to depose against his acts, says : “ for my part, I conceive that the case of Walton vs. Shelley was the best law, and ought to prevail against the latter opinion, which opens a door to fraud and perjury. 1 Hen. & Mumf. 174.
If this doctrine be sound, as to all acts in ge *529 neral, how much the more is it when applied to wills ? May the fate of so solemn an act depend on the perjury of witnesses, so indelicate as to come and give the lie before a court of justice to the truth, which their signature attests in an authentic act.? A witness, after he has voluntarily put his signature to an act, in which he declares that the testator appeared to him of sound mind, is not to be believed afterwards, when he comes to declare the contrary. Why ? because his signature gives a perpetual lie to his declaration, and because it is necessary that those, who affirm a fact before a court of justice, should not have previously attested the contrary. When in an act, the notary and witnesses have attested a fact, they may not be called on to disprove it, because once more their deposition would be in contradiction with what they have stated under their signatures ; their prevarication must always be proved by other witnesses. If we could deviate in any particular circumstance, from principles so evidently founded on reason, certainly it could never be in the case of a will. When, in such an act, witnesses have attested that the testator appeared of sound mind, they cannot come and say, without belying themselves, that the testator was not so found.
*530 If the morality of a witness is to influence the credit due his deposition, pray what idea presents of himself the subscribing witness, who comes forward, in order to contradict what is contained in an act, which he has subscribed ? When he was signing the will, the law, which consecrated his functions, presumed him to be honest and worthy of confidence. The testator, who sent for him, confirmed by his confidence this presumption. But the moment he opens his mouth to contradict what he has attested, he places himself in the most unfavorable point of view. The court, filled with indignation, evidently sees that the man who addresses it is an impostor ; what confidence can it give, therefore, to the testimony of a man who, by his own act, shows himself unworthy of credit ?
The public good demands that the fate of acts should not depend on the seduction and corruption of those who, after giving them authenticity, attempt to annihilate them.
A notary is an officer, in whom the public have placed their confidence. He is commonly one, whose probity and talents have been acknowledged. He is commissioned by the executive with the consent and advice of the highest branch of our legislature. Every thing *531 makes it his duty to preserve the good opinion that he must necessarily have given of himself in order to deserve that such important and honorable functions should be trusted to him. His rank in society is so high, that he must be either very blind or very corrupt to expose himself to lose, or even bring his character in question.
The persons who are commonly called to witness the execution of wills are offered by chance on the spur of the occasion, and their morality is often at least equivocal.
Let us suppose, and that is often the case, that a notary be sent for to a remote part of the city, and at a late hour, to receive the will of a wealthy man, having collateral heirs, whose conduct towards him has stifled all sentiments of benevolence, whilst more remote relations, or even strangers, have acquired sacred titles to his beneficence. The notary causes the three witnesses to be called, who are the most easily to be found. He is convinced that the mental situation of the sick man permits him to make his will. He receives his last dispositions ; and in order to have a written proof that he has complied with the disposition of the code, which forbids to receive the testament of any person insane, because he knows that a notary, like Cesar’s wife, not only must be pure, but must *532 also be unsuspected, he takes the wise precaution to state in the act the sanity of the testator by a clause, to which the witnesses agree, inasmuch as they sign it, without any kind of constraint or opposition. If afterwards these witnesses can be heard to contradict the attestation, will, not the heirs use every effort to seduce the witnesses and bring them forward in order to invalidate the will, and if it be a truth, which nobody can deny that interest is the principal cause of all crimes, will not witnesses in many cases be tempted to accept a bribe ?
If such witnesses could be heard, who is the man, who has collateral heirs having a legal right to his succession, ab intestato, who could dispose in favor of friends or even remote relations conformably to law, with the assurance that after he descends into the grave his greedy legal heir will not attempt to question his capacity and sully his memory by indiscreet inquiries, There is a doctrine more humane, more moral, in a word more conformable to the rules of justice, contained in our statute book, which provides, that, as soon as death has seized upon an individual, he ceases to belong to human justice, except in a specified case ; that the living shall not be permitted to take him out of his grave and drag him before a court, where it is no *533 longer in his power to defend himself, and there attack his capacity and his memory, with the view of seizing upon the estate he left. Civil Code, 80, art. 16.
Let us conclude, therefore, that we cannot absolutely receive either the declaration or deposition of a witness to a will, in which the mental capacity of the testator has been certified ; his deposition cannot be of any weight before a court of justice ; it is declared null by the law, without it being necessary to examine whether it be contrary or conformable to his written testimony. It adds no credit to it, if it contains the same facts ; it does not shake it, if it contains contrary ones.
If in France, wills containing the attestation of the notary and witnesses, that the testator was of sound mind, have been attacked on an allegation of the insanity of the testator, and witnesses heard to prove it : it is because, there, as we have already observed, from the very moment that an individual committed an act of insanity he was, by law, rendered absolutely incapable of making a will, and though he should have made one in a lucid interval, however wisely and legally he might have disposed of his estate, his will was null and void. The attestation of the notary and witnesses that the testator was *534 of sound mind shewed that the will had been made in a lucid interval ; but, as that was not sufficient for its validity, the heirs were permitted to prove the insanity of the testator before the will. But, I defy any one to cite a single case in France, where the subscribing witnesses to a will containing a declaration that the testator, at the time of making his will, appeared to them of sound mind, have been admitted to prove the contrary.
Will it be said, after such a decision, and without legal authority, that the declaration or attestation, which the notary and witnesses give in the will, that the testator is of sound mind is a matter of form, is a clause of style to which no importance is attached ? Let a court of justice, before they sanction such a legal heresy, reflect maturely, and consider the dreadful consequences to which it would lead. If any part of so solemn an act as a testament is to day declared a matter of form, there will be no bounds to the doctrine. To morrow a like decision will take place concerning another part of it ; the ordinary contracts will soon have the same fate, and the broadest of all doors will be opened to suits, disorder, confusion and ruin. There will be few testaments, in which the testator shall have disposed so as to deprive his legal heirs of a portion of his succession which, if the wil is annulled, will go entire to them, that shall not be successfully attacked.
*536 In Spain notaries generally receive wills according to the form prescribed in Part. 3, 18, 103, and that given by Febrero.
That given by the Partida is as follows : “ Know all men who shall see this instrument, that I, Estevan Fernandez, being sick of body, but of sound mind, make this my testament, §c.”
After prescribing how the testator is to dictate his will, in which it makes him speak always in the first person, it concludes : “ and on his part the notary is to state the place where the will was made, and before what witnesses, and the day, month and year.”
The form given by Febrero is as follows “ In the name of God Almighty, amen. I, such a one, & c, being through the divine mercy well and sound and in my entire understanding, &c.”
Here follow the dispositions of the testator, who speaks always in the first person, and the only words spoken by the notary, at the end of the will, are these : “ Thus dictated and signed before the present notary, at such a place, on such a day of such a month and year, A. B. C. and D. residing in the same place, being witnesses.”
It is clearly to be seen by what is stated, that in Spain the notary and witnesses are silent on the sanity of the testator, and it is in such cases *537 (and not in a case where the notary and witnesses have declared in the will that the testator appeared to them of sound mind) that they can be heard upon his sanity, according to what Febrero says : and even in that case, unless it be proved by the notary and subscribing witnesses in a clear and convincing manner, that the madman, at the time of making his will, was not in a lucid interval, the will is to stand.
Another reason which opposed the admission of the parole evidence of the insanity of the testator, at the time of making his will, is that which results from the wisdom with which he has disposed of his property. In it we see, it is true, that Erasmus R. Avart disposes of a portion of his property in favor of two natural children ; but, in these dispositions, who is the man, callous enough to all natural sentiments, who instead of seeing feelings natural not only to men, but to animals, will discover an act of insanity ? Certainly Avart, in becoming father of such children is not exempt from reproach in the eyes of morality ; but he did not infringe the laws of his country, since the framers of our code (more humane than certain stoics who have no indulgence for the frailties of others, because they were lucky enough to be born virtuous, or perhaps because circumstances have *538 favoured them) have impliedly permitted donations causa mortis and inter vivos, to be made to concubines, Civ. Code, 211, article 10, and, in several places, not only have permitted dispositions in favor of natural children, but have given them certain rights on the successions of their fathers and mothers. Our legislators knew that they were framing laws for men like themselves. At the time, that they wished to favor marriages, on which the prosperity and good order of society chiefly depend, they knew, also, that jura sanguinis nullo jure civili dirimi possunt. C. 8. de reg. jur. It is evident, therefore, that Erasmus R. Avart, not only obeyed the dictates of nature, but, also, acted under the authority of the law. He could, according to it, institute as his heirs other persons than his brothers and sisters. He could, as it is often practised in this country, after disposing in favor of his concubine and natural children of all the law permitted him to bequeath to them, institute for his heir some friend, who would have taken the obligation to dispose of his succession, according to his directions. But that he did not do ; he again obeyed the dictates of nature, and instituted as his heirs those very brothers and sisters, who come now to contest his mental capacity.
*539 Let any person read the will with attention ; let him examine every one of its clauses; let him reflect that it is the testator himself who has dictated it, as appears not only from the instrument itself, but from the declaration contained in the opinion given by the judge a quo, in refusing the new trial, in which, he says : “ it is fully admitted that the last will was dictated to the notary in the presence of the witnesses, as the copy thereof has exhibited it,” and let him pronounce, if he dares, that it is not the work of a man who, at that time, did enjoy the plenitude of his mental faculties.
There is not an impartial man, but, who after reading the will carefully, will declare that if the testator had ever been mad, he was, beyond any doubt, in a lucid interval, when he dictated it.
Castillo says, the common opinion of doctors is that a contract, or testament, properly made by an insane or mad person, who had lucid intervals, is good and valid in the same manner as if it had been made by another, though there would be no proof, that at the time of making the act, he had lucid intervals : because, the presumption of madness is destroyed by the quality of the act made afterwards, to such a degree, that if the act made becomes a man of a *540 sound mind, the person, who has made the act, must be presumed to be of sound mind at the time of making it. Loco citato. He adds : Petras Magdalenus, adopting the sentiment of a great number of others, observes that if it be proved that a madman has lucid intervals, and should make an act becoming a man of sound mind, then from the very quality of the act, it must be presumed that the act has been made at the time of a lucid interval, and therefore, it shall be valid. Id.
As to the suicide of Erasmus R. Avart, in which some would find an evident proof of insanity, and particularly the judge a quo in his reasons for refusing a new trial, I would observe that it is true, in some particular instances, that madmen have committed suicide ; but it is paralogizing, it is infringing the precept of logic which forbids to conclude from the particular to the general, to say that all suicides are the acts of madmen. Never has suicide been considered as the necessary effect of madness. The only question which has been agitated concerning suicide, by great men of all ages and countries, is whether it be an act of cowardice or bravery ; much has been ably said for and against and adhuc sub judice lis est. A celebrated author has written, on the subject of suicide, two admirable letters ; one for, and the other against. Let any one read those letters of Jean Jacques Rousseau, and I am persuaded, that it is ten to one, that he will consider the arguments for suicide a great deal stronger, than those against it, though the author’s intention was to be a *542 gainst it. What can be answered to what he says in the first letter ?
“ According to them (the sophists) it is cowardice to rid one’s self from grief and pain, and those are cowards, who put an end to their existence. O Rome, the conqueror of the world! That Arria, Eponina, Lucretia be called cowards, may be conceived : they were women. But, Brutus, but Cassius, and thou, who didst share with the gods, the respect of mortals, great and wise Cato, whose august and sacred image filled thy countrymen with a holy zeal, and made tyrants tremble, thy proud admirers were far from thinking, that one day, in the dusty recesses of a college, vile schoolmen would demonstrate that it was through cowardice, that thou didst refuse to successful crime the homage due to enslaved virtue. O modern writers ! how great and sublime are you, and with what intrepidity do you wield a pen !”
We will add here the remark made by a great writer, after reading Rousseau’s letters :—
“ Let us not trust to the prejudices of ages and nations. When it is not fashionable to kill one’s self, those who do it are considered as mad ; all acts of valour are as many chimeras for week souls : every one judges of others by *543 himself. However, how many well attested ex-amples have we of wise men in every other respect who, without remorse, without madness, without despair,renounce life, only because they are tired of it, and die with more composure than they lived !”
But even if it be admitted that suicide is always the effect of madness, Avart’s will was received after suicide had been committed by the testator, and of course at a time when he could be in a lucid interval.
Again, if the testimony, given by one of the witnesses to the will, is not explicit, then the three witnesses do not prove, as Febrero says, in a clear and convincing manner that the testator was not in alucid interval, when he made his will, and for that reason, it ought to be maintained.
I ought to stop here, convinced that what I have said is sufficient to determine the court to decide that the defendants cannot contest the will of their brother for cause of insanity, or at least that no testimony was admissible against *545 the attestation of the notary and witnesses, contained in the will, that the testator was of sound mind, no fraud or constraint being alleged. But the plaintiff has appealed from the refusal of the parish judge to grant a new trial, and it is the duty of her counsel to examine whether he did not err in this respect.
Judges, as all other public officers, are essentially established for the advantage of society. Their first guide, that which they cannot abandon without prevarication, is the law ; their first duty, that of which they must be the slaves, is justice. In certain cases a discretionary power is left them ; but always under the solemn, though tacit condition, that they shall use it only for the promotion of justice.
Let us weigh the reasons which might have induced the judge to refuse the new trial and those which ought to have induced him to grant it ; as I take it to be the rule that when this court are of opinion that, had they been in the place of the judge a quo, they would have granted the new trial, they are bound by law and their conscience to order it to be granted.
The law says, that, as well in causes where facts are tried by a jury, as where the trial is had by the court, whenever new evidence, material to the cause, shall have been discovered af *546 ter the said trial, which the party could not, by reasonable diligence, have discovered before, if it shall appear that justice has not been done, the court, on the application of the party injured by such verdict or decision, may grant a new trial.
The plaintiff’s counsel having discovered, after the trial, new evidence, of the nature contemplated by the law, applied for a new trial.
What were the motives of the judge in refusing it ? Before transcribing them, let me be permitted to make an observation, on a doubt which the judge expressed, and on which I would expatiate, were I not the person who made the affidavit. It is a maxim of law, I believe, that what a person declares, under oath, is to be believed, till the contrary is proved, and according to this mnxim, I think the judge would not have been correct had he done, what he declares, with a sham generosity, to have waived to do, that is : expatiating in order to ascertain whether or not, the new evidence, by reasonable diligence, could have been discovered before.
He says that Cherbonnier’s testimony (offered to prove, that he saw the testator about two hours after he made his will, remained and conversed with him a considerable time, and verily *547 believes that he was, during the whole of that time, of sound mind) not being stronger than that of father Antonio, who was introduced to the testator, just as he had finished his will, and declared that the testator had appeared of sound mind, the court could not be convinced that this weaker and later testimony, could alter the opinion of the jury.
The judge declares that the testimony of Ristaud, is no more material, than that of Cherbonnier, because it only corroborates what is evidenced by the testament ; that is to say, the testator’s constant desire to make the plaintiff free. Had the judge paid any attention to the signification of these words, when he put them on paper ? What ! the testament evidences by itself the testator’s constant desire to make the plaintiff free ? If it does, I must confess my incapacity of discovering it.
But let us see, what the testimony of Ristaud would have established. It would have shown *548 that Choppin, the brother-in-law, and the intimate friend of Erasmus R. Avart, and who of course knew whether Avart was mad or not, had lent him the day before, a check in order to purchase the plaintiff, and emancipate her ; and that the disposition of Avart, in favour of the plaintiff and her child, was the consequence of a premeditated and long entertained resolution of the testator, of which he had informed a man nearly related to him, his sister’s husband.
It is a testimony of this kind that the judge calls trifting, and which he takes upon himself to declare incapable of operating on the minds of the jury ? How ! a jury would not have a strong reason to believe that Avart’s insanity was not a fact so constant, when they should have seen that his brother-in law lent him a check, of no small amount, since it was for the purchase of the plaintiff and her child, the very day before he made his will ! Is money now so easily to be had, as to be lent to madmen ?
Let us now examine, what reasons ought to have induced him to grant the new trial.
One of the reasons on which the judge grounds his refusal is, that the statute provides that a special verdict shall be conclusive between the parties as to the facts in the cause as well in the court where the cause is tried, as on the appeal, and must be the judgment of the court. The law does not say that the finding of the jury shall be the judgment of the court, because in such a case, it would be a general finding, which is reproved by law.
*550 Has the legislator meant that the judge should always adhere to the special finding of the jury, however unjust, or erroneous it may be ? No such monstruosity : he has taken the care, with a paternal solicitude, to add immediately to that legal disposition two provisoes : one of which is, that nothing shall prevent the court from granting a new trial, when by law, either of the two parties is entitled to the same.
But it was enough to determine him to grant the new trial, that new and material testimony had been discovered.
We have often seen judges after deciding cases themselves grant new trials, for, they were convinced their judgments were not infallible, and their minds were always open to conviction.
Have we not seen many a time this court, where certainly we are not to find less information and experience than in our other courts, grant rehearings and alter decisions which they had rendered after the most mature reflexion ? *551 And, in this conduct, which does the more honor to the judges who preside, the public find an assurance, that their only aim is justice.
The record shows that the plaintiff did not object to the introduction of any witness, offered by the defendants.
The 10th section of the act of 1817, has provided, that in every case to be tried by a jury, if one of the parties demand that the facts, set forth in the petition and answer, should be submitted to a jury, to have a special verdict thereon, both parties shall proceed, before the swearing of the jury, to make a written statement of the facts so alleged and denied, the pertinency of which statement shall be judged of by the court and signed by the judge, and the jury shall be sworn to decide the question of fact or facts, so alleged and denied, and their verdict, or opinion thereof, shall be unanimously given in open court, and shall be recorded by the clerk, and after having been so given and recorded, be conclusive between the parties, as to the facts in said cause, as well in the court where the said cause is tried, as on the appeal, &c. Acts of 1817, p. 32.
The only question before this court is, did the judge err in allowing this issue to be submitted to the jury, in other words is it a pertinent one ?
Our statute provides that no disposition causa mortis shall henceforth be made, otherwise than by last will or testament, Code Civil, 237, art. 81, and to make a donation inter vivos or mortis causa, one must be of sound mind. Id. 208, art. 4.
In vain, in order to avoid the fact of the sanity of the testator’s mind being submitted to the jury, did the plaintiff’s counsel invoke the part of the statute, which provides that, after the death of a person interdicted, the validity of acts done by him or her cannot be contested for cause of insanity, unless the interdiction was pronounced or petitioned for, previous to the death of such person. Id, 80, art. 16. Admit *553 ting this provision to be applicable to all acts, without any distinction, and consequently to testaments, it prevents, at most, the introduction of any other proof of the insanity of the testator, than the sentence of the competent judge, or a petition presented to him to procure the interdiction.
If the plaintiff’s counsel had thought that this part of the code prevented the introduction of oral evidence of the insanity of the testator, after the jury were sworn, he would have opposed the introduction of such evidence, and if his objections had been overruled, he would have excepted to the opinion of the court. The record shows he did not do so ; the conclusion presents itself forcibly to the mind, that he then thought, as I do, that this provision of the code is not applicable to testaments. But, whatever his opinion may have been, he ought to have excepted to the opinion of the court a quo, admitting improper testimony. Questions of this kind can be examined in this court upon a bill of exceptions only.
In saying that the plaintiff’s counsel ought to have excepted to the introduction of witnesses, if any were introduced, to prove the insanity of the testator, I am supported by the law and practice of this court. It cannot notice any fact which *554 does not appear by a statement legally made. It cannot notice a fact mentioned in the opinion of the inferior judge. Nothing, in the record of this case, shows on what kind of proof the jury have pronounced, nor that any piece of evidence offered was objected to.
I might stop here, as to the first ground taken by the opposite counsel ; but, I am willing to admit, for argument’s sake, that without any opposition having been made thereto below, and although no part of the record shows that any oral evidence was tendered, he may urge, in this court, that such evidence was inadmissible.
However general and indefinite, the provision of the statute relied on by the plaintiff’s counsel (Civ. Code, 80, art. 16.) it is incorrect to say that it extends to all acts, without distinction, even to donations causa mortis.
I admit that this provision is an innovation and that before the promulgation of the civil code, interdiction on account of insanity was not known to our laws ; hence, I conclude that it is not in the Spanish law, that we are to take a guide in the application of this new provision. We ought rather to seek for information in the work, from which this amendment in our jurisprudence has been drawn, the Napoleon code, from the 504th article of which the article under consideration is literally copied.
*555 If we find that this 504th article is considered by the courts and jurists of France inapplicable to a testament, unless the reasons on which the restriction is grounded appear to us in opposition to the sound rules of interpretation, we will be induced to conclude that the same expressions, literally copied in the corresponding part of our code, ought not to receive a greater extension. What is reasonable and just in France, must be equally so in every other country, on the same principles.
Before I proceed to examine the decisions of the superior courts of France, and the opinions of the ablest lawyers of that country, I must pray the court to observe that another article of our code, cited by the plaintiff’s counsel is also, a literal copy of the corresponding one in the Napoleon Code. To make a donation inter vivos or causa mortis one must be of sound mind. Civil Code, 108, art. 5. To make a donation either inter vivos, or causa mortis one must be of sound mind. Code Napoleon, 901.
Paillet is the first author, to the works of which I am to draw the attention of the court. In his note on the 504th art. of the Napoleon Code, of which the corresponding article in our code is a literal copy, he observes : the acts of *556 a person, who died before the promulgation of the code, may be attacked on the ground of insanity, although no interdiction was provoked before his death. The 901st article which provides that in order to dispose of one’s property by donation or testament, one must be of sound mind, has received no restriction from the 504th article, which is applicable only to ordinary acts, and not to donations and testaments. The utmost latitude is left to courts to admit and reject evidence of insanity, in regard to a will or donation. Cour de Poitiers, May 27, 1808.
In the proces verbal of the council of state, containing the debates on the project of the code (vol. 2, p. 137) we find that the 17th article of the project, in the title of majority and interdiction, which is now the same article in the same title, and the 504th of the code, was proposed and adopted, in the same words, and without any difference from the corresponding article in our code.
We find also, id. 348, that the disposition, contained in the 901st article, was in the project expressed thus : “ in order to make a dispotion inter vivos or mortis causa one must be of sound mind. These acts are not be attacked on the ground of insanity, except in the case and in the mode prescribed by the 17th article of the title of majority and interdiction.”
*557 If the legislators of France had intended that the 17th article of the project, now the 504th of the code, should be applied to donations and wills, as to other acts, it is clear that they would have preserved the second part of this 901st article, which in the project was the 16th of the first chapter, entitled of the capacity to dispose or receive by donation inter vivos or testament.
We find in the same volume, p. 350, that one of the members of the council, Cambaceres, then second consul, and one of the most enlightened lawyers of France, thought that this second part presented a disposition too absolute ; that another member, Tronchet, not less celebrated as a jurist, added that the 17th article of the project (now the 504th of the code) to which reference is made, is too restricted. “ It allows only the family to plead the insanity of the grantor” says he “ when his interdiction was provoked during his life : but the family hoping for the recovery of their chief, are long prevented by such an hope, from provoking his interdiction ;” that Cambaceres added “ the first part of the article provides for every case. Insanity is a fact, and the law determines how it is to be proven ; the second present the inconveniencies of which citizen Tronchet speaks, *558 it is unfavorable to legal heirs, and in opposition to the spirit of our legislation, which favors them he added afterwards “ much latitude is to be given to proof ; it ought not to be restricted by conditions which some times totally exclude it. An individual may have preserved a sound mind, till a very short period before the donation or will, and then it becomes impossible to prove his insanity, if the restriction is preserved. The first part contains a plain rule, which suffices : the rest ought to be left to the court.”
Emmery, another member, observed that the 17th article of the title, interdiction, in the project, the 504th of the code, does not relate to donations or testaments.
We find, by the code itself, that the first part of the article was alone adopted ; and the second was rejected, and this according to the observations of Cambaceres ; or, as was said by the orators of government, when they presented the work of the council of state to the legislative body : “ the will of him who disposes, ought to be certain ; it cannot exist, if he be not of sound mind : it has sufficed to express thus, the general principle, to make a donation in er vivos or a will, one must be of sound mind, in order to leave to the judge the utmost latitude in its application.
*559 It is then clear that the legislators of France, did not intend that the 504th article of the Napoleon code should extend to donations or wills.
If we except a decision of one of the courts of appeal, soon after the promulgation of the code of Napoleon, all the sovereign courts of France, and principally the court of cassation have consecrated the principle, we have cited from Paillet, viz. that the 504th article, which prohibits an act to be attacked on the ground of the insanity of the maker, does not extend to donations and wills, and that the 901st, which requires that a donor or testator should be of sound mind, is not restrained by the 504th.
In a decree of the court of cassation, of the 22d of November, 1810, that tribunal “ considering that the article 504th of the Napoleon code is not applicable to donations inter vivos, or testaments, which are especially regulated by the 901st article, definitively adopted and promulgated in these words : to make a donation inter vivos, or a testament, one must be of sound mind, there results, from the generality of the expressions used, that notwithstanding the articles 1341, 1347, 1352, and 1353, of said code, parties are permitted to allege, and courts to receive, proof of facts from which it may result *560 that a donor or testator was not of sound mind, when the deed of gift or will was executed, without enquiring whether these facts are or are not evidence of a permanent insanity, rejects, &c.” 11 Syrey, 75, 1st part.
The imperial court of Colmar, in a decree of the 17th of June, 1812, expresses itself thus: “ whereas of all the allegations of the appellees, to set aside the will made by Magdalen Joegen, on the 1st of September, 1808, the first and principal one is, that they maintain and offer to prove that before, at the time of and after the execution of the will, the testatrix was in a permanent state of weakness of mind, childhood and even imbecillity ; and it is important, before examining the case further, to ascertain the truth of these allegations, which may have a material influence on the cause, and whereas this proof is admissible, although no interdiction was pronounced or provoked against the testatrix, before her death, because, according to the 901st article of the Napoleon code, one must be of sound mind to make a donation inter vivos ; a fact not of the substance of the act, though essential to its validity. And whereas the article 504, was improperly relied on by the appellants, since the legislature did not intend to extend it to testaments, which are re *561 gulated by the article 901 ; for these reasons without pronouncing on the merits, and with a reservation to the parties of their respective rights, the court allows proof to be made of the alleged insanity, &c.”
I do not pretend to place these cases before this court as precedents of binding authority, neither do I contend that the arguments of these tribunals are entitled to any other weight than that which they derive from their conformity to principles, recognised in our courts.
But before we examine the motives which actuated the tribunals of France, let us notice the attempt of the plaintiff’s counsel. He contends that the will contains an enunciative clause, that the notary and witnesses have found the testator sick, but of sound mind, memory and understanding, as it appeared to them, and that now to admit parol proof of the contrary, would be to violate a provision of our statute, which prohibits such a proof against or beyond the contents of an act. Civil Code, 310, art. 242.
In the first of the two cases, which I have just cited, two questions were submitted to the court. Was the testatrix of sound mind, as the instrument mentioned ? Did she dictate the will, as is therein expressed, or, as is alleged, was her tongue so swollen that she was unable to *562 articulate any sound, which might be understood ?
The legatees relied on the 504th article of the Napoleon code ; and contended that, since the testatrix died integri status, and no interdiction was pronounced or provoked, the code forbade any inquiry as to the sanity of her mind ; that this article reached all the acts of the testatrix, and was applicable to the will, unless it was held that a will is not an act.
The heirs replied that the legislator had not intended to extend the article 504th to donations and wills, since it has provided for acts of this kind in a special article—the 901st.
The legatees urged, before the court of cassation, that two notaries having certified in the will that the testatrix was of sound mind, memory and understanding, the testimony of these officers, clothed with the confidence of the law, could not be balanced or destroyed by oral evidence, without a violation of the article 1341 of the code Napoleon, which prohibits oral evidence against or beyond the contents of an act.
The attorney general Merlin thought that the word act was not necessarily to be extended to donations and last wills ; that the article 504 could not aid in the interpretation of the article 901, that such was the manifest intention of the council of state.
*563 He observed that there was an essential difference between the offer of proving that the testatrix was insane, when the will was made, and that of proving that she had not dictated it, since her tongue was so much swollen that she could not articulate a word. The first allegation does not give the formal lie to the act ; it does not tend to prove any thing against it—the contents of an act, because a notary who enounces in a will that the testator is of sound mind, does not speak affirmatively thereon : he only indicates what appears to him : he does not establish the sanity of the testator’s mind—this is foreign to his duties. Whatever he says thereon is out of the substance of the act, and appears only a simple enunciation, without any importance, in the eye of the law : his assertion is no proof and does not prevent the admission of parol evidence. As to the offer of proof that the testatrix did not dictate the will, he considered it directly against the contents of the act, because the declaration of the notary is, in this respect, affirmative and of the substance of the act ; his office being to certify that the testator dictates his will.
In every act, says d’Aguesseau, we are to distinguish two species of things, the one, which is of the substance of the act, is the convention *564 which it contains, negocium quod geritur, the other capacity, will and disposition of the party. The first, i. e. the clauses, the stipulations, the nature of the act, are proven by the act itself : we may add what concerns the exterior solemnity of the act, of this the law neither requires or admits any other proof. Contra scriptum testimonium, non scriptum testimonium non admittitur. Not so with regard to the capacity of the party : the act supposes, but does not prove it. The act is not intended to establish this, none of the intervening parties, think of the proof of this fact : they do not question it. The notary, witness of the engagement which is taken, is not charged by the law with being the judge of the capacity of the parties : if suffices that they do not appear to him incapable. This is so true, that though in last wills usage has introduced a clause, in which it is stated that the testator is of sound mind, memory and understanding, it is never considered as written proof of mental sanity. The court has often decided that, notwithstanding this clause, the allegation of the testator’s insanity is admissible, and without the acts being attacked as false, because, in this respect, the notary steps out of the line of his duty. He is indeed, as instrumentary witness, honored with *565 the confidence of the law, depository of the public faith ; all this, that be may bear a faithful testimony of what passes between the parties, not to judge of their capacity or wisdom. d’Aguesseau, 37, plaidoyer 1, Syrey, 1st part, 73, 75.
To those arguments of d’Agnesseau and Merlin, nothing, that I can say, can add weight. I will only ask the court to remark, that the clause of a will, in which the testator is stated to be of sound memory and understanding, has only been introduced in France by usage ; usage has recently only introduced it among us. Neither our former nor our present system of laws make it the duty of the notary or witness to speak of the sanity of a testator’s mind. No part of the acts of our legislature reqnires it. As to the Spanish laws, we would in vain seek in them any thing that would justify the pretention of a notary, to set himself up, either as a judge or an irrecusable witness of the soundness of mind of an individual, who applies to him to receive his will.
The 103d law of the 18th title of the third partida, the only one which treats of a nuncupative will, requires that the testator should dictate and the notary write down his dispositions ; that he should himself express the situation of *566 his mind ; not that this should be done by the notary ; not that the notary should report or relate what the testator has said ; but that he should write down the will, from beginning to end, causing always the testator to speak in the first person of the indicative present. “Let all those, who these presents shall see, know that I, Stephen Fernandez, being sick of body, but sound of mind, make this my testament, in which I declare my last will. I bequeath, &c.”
This law of the partida has not been relied or modified by any subsequent one. The forms, which are found in Spanish hooks of practice, are all conformable to this law, particularly Febrero, part 1, ch. 1.§ final.
These authorities will suffice to shew that the authorities drawn from d’Aguesseau and Merlin, and the decisions of the sovereign courts of France, are to have considerable weight with us.
It does not follow, from the circumstance that a few notaries have lately been pleased to alter the form of receiving last wills, which the law prescribes, and to set down, not the state of mind, in which the testator has declared himself to be, but their own individual opinion of it, that it is either reasonable or legal to contend that when the notary’s enunciation, attested by the *567 witnesses, that the testator is of sound mind, memory and understanding, appears in a will, parol evidence of the contrary cannot be received.
The plaintiff’s counsel urges that it cannot be denied that in France, this question has been diversely determined, and the judges have here a greater latitude than there. He ought to have known, that, the decisions of the sovereign courts, and principally of that of cassation, are in opposition to the interpretation he gives to the law ; an interpretation which does appear to have been admitted but once, in one of the courts of appeals, soon after the promulgation of the code. He ought to have known also, that if judges have any latitude in France, it is only that which the law allows to them : and that there is a court of cassation established for the sole purpose of revoking, annulling, and reversing decisions of courts of original and appellate jurisdiction, which contravene the dispositions of the law. He ought to have known that the decision of this last tribunal, which condemns the principle he contends for, is grounded on a precise text of law, the article 901 of the Code Napoleon, of which the corresponding article in our code is a literal copy.
*568 We are told that courts must decide, not in conformity to anterior decisions, but in conformity to the law. This is surely, a very correct proposition. It ought to govern, where a clear and precise law has been eluded, and instead of taking the law for a guide, a decision has taken place according to that of another tribunal, in a like case. This proposition ought nevertheless to be disregarded, and we ought to be on our guard against it, where we have to apply a new law, containing dispositions, apparently general, which may render illusory an other disposition, not less textual, but special ; then wisdom, prudence, and modesty require that we should avail ourselves of the labours of learned men, in the country from which we derived the new law. Reason tells us they must understand it better than us. If all precedents were to be disregarded, would the legislature have made it the duty of the governor to procure the decisions of our supreme court for the information of inferior tribunals.
Admitting, however, that instead of availing ourselves of the information of the lawyers of France, on a legal disposition for which we are indebted to the wisdom of the French code, it should be our duty to consult Spanish writers only, or the code of that nation, I can only *569 shew without resorting to other authorities, than those adduced by the plaintiff’s counsel, that the jurisprudence of Spain is not less unfavorable to him than that of France.
“ All those, who are not prohibited by the laws of this our book, can make a will : those who cannot make it are these, the son, under paternal power, &c. Farther, he who has lost the usage of his mind, while he is in such a situation. El que fuesse salido de su memoria, non puede facer testamento mientre que fuesse desmemoriado. Part 6, 1, 13.
“ Likewise, the mad and the insane, loco y desmemoriado, cannot make a will, while they are so. But the will is good that was made before the insanity or madness, as well as that which is made during a lucid interval, provided it be perfected during such interval : but if before it be perfected, the phrenzy returns, it is invalid —and thus, in order to annul the will of a madman, who has lucid intervals, it is necessary to prove conclusively, by the notary and instrumentary witnesses, that at the time the will was made, he was mad, and not in a lucid interval.” Febrero, contratos, 1, 1, n. 10.
How can the plaintiff’s counsel urge that parol evidence of the testator’s insanity cannot be received, when the will contains the enuncia *570 tive clause that the testator was of sound mind ? Had it escaped him that the law of the partidas requires, and Febrero teaches, that the will ought to contain this clause ?
“ Men often make their testaments, and a testament ought to be thus written : Know all men, who shall see these presents, that I, Stephen Fernandez, being infirm in body, but of sound mind, make this my testament, in which I declare my last will. First, I give to the church, &c. and thus ought the notary write down all the legacies. If, per adventure, the testator desires that it be written down that he disinherits his son, the notary ought to put down the reasons, &c. After which, it ought to be said, at the end : I,Stephen Fernandez, aforesaid, order and require that this my testament, and last will be valid forever : and I desire and order that every testament or bequest, which I may have made before this, be cancelled and invalid ; and if any other my last will and testament should thereafter appear made after this, I do will and desire it may not be valid, unless therein mention should especially be made of this, saying that I revoke it, or any part thereof. And the notary ought to say, in what place the will was made, before what witnesses, and the day, month and year.
*571 If usage has introduced in France, the clause, by which the notary certifies the state of mind, in which the testator appeared to be, it is evident that it is by usage also that the clause has been introduced here, as has been already observed. The law cited clearly and precisely shews that it is the testator himself, who ought to declare that he is sound of mind, and the province of the notary and witnesses is only to bear faithful testimony of such a declaration : but not to certify the state of the testator’s mind.
If then, the only difference between what happens in France, and what is done here, be that, there the usage which is followed leads to no consequence, but that the one adopted here of late, by the notaries, be a direct violation of a positive law, not abrogated, is it reasonable to say that, in the case before us, oral evidence ought to have been rejected ? On what grounds, could these depositions be rejected ?
The plaintiff’s counsel, when he launched into pompous declamations, on the pretended danger of admitting these depositions, in opposition to the clause in the will, ought to have reflected, that if there was any infraction of the law, the notary alone was guilty of it, in putting in the mouth of the witnesses, what could only *572 legally come from that of the testator. Will this wrong of the notary deprive the defendants of the right which, according to Febrero, the law gives them to examine these witnesses, under oath, on the state of the testator’s mind. No ; this would be substituting the will of man to that of the law.
The authorities drawn from Covarrubias, Castillo, &c. vanish before that drawn from Febrero. Were we without the latter, it is not to be believed that the former would have much weight. Indeed, can it be reasonably urged that there exists no difference between a solemn deposition made under the sanction of religion, in the presence of a magistrate, the organ of the law, and a simple allegation, subscribed by witnesses, whom the plaintiff’s counsel admits are often taken at random, and on whom little reliance can be placed ?
If there be, in the case under consideration, any apparent contradiction between a clause of the will, and the deposition of its subscribing witnesses, under their oaths, this results from the fault of the notary. This fault might occasion the nullity of the will ; for it is a violation of the only law, which prescribes the form to be observed by the notary in receiving a will.
*573 Will it be said, that although the subscribing witnesses may be admitted to depose, their deposition does not suffice alone, and without that of the notary ? One word suffices in answer to this—the notary is the plaintiff’s counsel, and a particular lay of this state forbids counsel being sworn for or against their clients.
It is clear, that notwithstanding the mention made in the will of the sanity of the testator, oral evidence was admissible of the contrary. This is the case, even as to clauses which are of the substance of the will ; as those which express that it was dictated by the testator and written by the notary. Since the promulgation of the code, notwithstanding the provision that no parol evidence is to be admitted against or beyond the contents of an act, witnesses have been heard in order to set aside a will in which it was falsely mentioned that these formalities had been accurately fulfilled. Knight vs Smith, 3 Martin, 156. The decision, in this case, is grounded on the ancient laws of the country. “In the will ought to be expressed the place, day, month and year ; and the witnesses who were present at its execution, with the name of each one, before whom and the notary : the testator ought to express his intentions clearly, and distinctly, so that each of them may hear *574 him at the same time, and that in case of doubt, they may all of them depose, being thereupon interrogated. Febrero, Contratos, 1, § 19, n. 207.
Although I have noticed, and I believe have shown the futility of, all the objections of the plaintiff’s counsel, I beg leave to remind the court that the only question before it is that which results from the only bill of exceptions, in this case, taken on the decision of the parish court, in allowing the issue, proposed by the defendants to be submitted to the jury, viz. whether E. A. Avart was of sound mind, at the time of making the last will or testament, upon which the present action is brought ?
As to the kind of proof resorted to, in order to satisfy the jury that the testator was not of sound mind, no question is before the court and it cannot judge of the legality of such proof. The plaintiff’s counsel had it in his power, by a bill of exceptions, to bring the question before this court ; he declined or neglected availing himself of it. It is now too late.
As to the new trial, I contend that the decision of the inferior judge, in refusing to grant it, cannot be appealed from. The grant or denial of a new trial is entirely left by law to the dis *575 cretion of the judge. Indeed, in order that the supreme court could take cognizance of the question, it would be necessary that it should have before it all the circumstances, which may have weighed with the inferior tribunal. In the present case, no part of the evidence has been taken down, and if this court were to pass on it, it would have nothing before it, but the affidavit, not of the plaintiff, but of her counsel.
Was this affidavit admissible ? Was not the reading of it a violation of the statute, which forbids an attorney to be witness for or against his client ? Will it be said that the maxim nemo testis in propriâ causâ does not preclude the party himself from testifying, in order to procure a new trial, that he has discovered new evidence, which, with ordinary diligence, be could not obtain before the trial ? Let us admit, for argument’s sake, that the client and his attorney are, in this respect, as two partners or solidary debtors. Would it suffice that either of the partners or debtors should swear that he has discovered new and material evidence, which, with ordinary diligence, he could not have obtained before. Would it follow from the circumstance of one of the parties not having discovered the evidence until after the trial, that the other was not apprised of its existence. *576 In this case, the client may have known, that which her attorney swears he was ignorant of. The law does not make it the duty of the attorney to seek for evidence, it imposes that obligation on the client. The latter, therefore, not the former, ought to swear, in order to obtain a new trial, that he was ignorant of the existence of the newly discovered evidence, and that he neglected none of the means, in his power, to procure it. 2 Martin’s Digest, 156.
There is only one case in which the party’s own affidavit may he dispensed with ; when he is absent.
I have said that, in order that this court might examine the conduct of the parish judge, in pronouncing on the motion for a new trial, it would be necessary that it should be in possession of every fact, that may have influenced his decision. How, otherwise, can it say that he erred, in considering the evidence newly discovered as less strong, less clear, and less positive, than that which had been introduced at the *577 trial ? Can this court, without knowing; what evidence was before the jury, determine that it would be outweighed by that which was alleged to have been newly discovered ? The parish judge means to discover the truth, which are not, cannot be placed within the reach of this court. He heard the testimony from the lips of each witness, he noticed his natural or studied mien, his calmness or agitation, his assurance or his timidity.
Admitting, however, for the sake of argument, that this court, notwithstanding all this, may think itself competent to revise the decision of an inferior court, in denying a new trial, let us examine the evidence which is pretended to have been discovered.
Cherbonier, it is said, went to the testator’s, about two hours after the will was made, and remained with him a considerable time. He conversed with him and verily believes that, during the whole time, he was of sound mind.
The question, submitted to the jury, was not whether the testator was of sound mind, before or after he made the will, but simply whether he was so at the time, he dictated and subscribed it. This they have answered negatively : and it is impossible to imagine that the verdict of the jury would have been different, had it been previously shown, that Cherbonier, or any other person, believed him of sound mind before or after. Cherbonier proved his belief not the existence of this fact.
The plaintiff was enabled to shew that Risteau was with the testator, after he had stabbed himself and before the will was made, when Choppin, the testator’s brother in law, took from a desk a check which he had given the later, on the preceding day, to enable him to purchase the plaintiff for the purpose of emancipating her.
We are ignorant of, but are willing to believe, all this, because Risteau appears to have told it to the plaintiff’s counsel. All that result from it, is that, when Choppin gave the check to his brother in law, he believed him of sound mind, not that he was so, at the time the will was made. If it be *579 true that the amount of the check was to be appropriated to the purchase of the plaintiff, with a view to emancipate her, the circumstance, of his having inserted in the will a clause which tended to carrry his project into execution, does not establish the fact of his being of sound mind, when he made the will.
All that result from this, is that the idea of Marie filled his mind, that his passion for that slave ruled him and was perhaps the cause of his insanity and his death. Is it surprising that a man enamoured in perfect health, should have the object dear to his heart present to his mind in a moment of delirium : and when, in such a situation, he speaks of her, are we to conclude that he is in his perfect senses ?
The court will appreciate the gounds, on which the plaintiff’s counsel declares himself fully convinced of the goodness of his cause : we confidently wait their decision, relying too much on their justice and learning to apprehend that a mistaken sense of humanity will induce them to disregard the disposition of the law.
I candidly admit that I incorrectly stated that witnesses were offered to prove the insanity of the testator and that I excepted *580 to their introduction. The fact is that, when the issue intended to be submitted to the jury was about to be reduced to writing and before they were sworn, I opposed the submission of it to the jury, as forbidden by the statute, Code Civ. 80, art. 17. The judge overruled my opposition and I tendered and he signed the bill of exceptions which comes up with the record. A mere reading of this bill is sufficient to shew that I opposed the introduction of any kind of proof whatever, of the fact that the testator was not of sound mind, at the making of the will. In good logic, the whole includes all the parts. So, it is in jurisprudence. In toto pars continetur. l. 13 de reg. juris, In eo quod plus est, semper est et minus. So it was needless for me to repeat my opposition, when each witness was offered. The court must see by a reference to the article of the code, which I relied on, that it was less to the submission of the issue to the jury, than to the introduction of evidence to support it, that I objected. The bill clearly shews that the defendants had no record, shewing that the interdiction of the testator had either been obtained or provoked. Without this, could they be allowed to attack the will on the score of the testator’s insanity ? Whether the evidence was written or oral, it was *581 equally inadmissible. It was prohibited by the part of our statute which forbids that, after the death of an individual, the validity of acts done by him be contested, for cause of insanity, unless his interdiction was pronounced or petitioned for before his death, and that part which forbids that evidence be admitted beyond or against the contents of an act Civ. Code 81, art. 16 and 311, art. 242.
The first of these articles is copied from the 504th of the Napoleon Code, as the article 4, page 209 of our code is copied from the 901st. The articles of our code are, in the classification of the whole work, in the same order, as the corresponding ones of the Napoleon Code. If the principle, which in France, has led courts and jurists to conclude that the article 504, includes donations and wills be true, just and reasonable in all countries, we ought to adopt it, unless that, which has influenced other courts and jurists to adopt a different opinion, appear to us more true, more just or more reasonable. Let us therefore inter into this enquiry, which is to direct the decision of this case.
A number of celebrated jurists have emitted their opinions, before and since the decree of the court of cassation on which the defendants’ counsel chiefly relies, and they all conclude that the 504th article *582 indudes donations and wills. In 8 Pand. Fr. 523, we have observations on the 901st article.
According to the 503d article, if the interdiction of the donor or testator has been pronounced, allegation and proof may be received of the existence of the insanity, at the time of the donation or testament. So, according to the 504th, when the interdiction was at least provoked, during the life of the donor or testator. In the contrary case, the proof of insanity must result from the very act which is attacked, otherwise the plea of insanity cannot avail.
It is to be admitted this rule is extremely strict and may give rise to great inconveniencies. It affords, says the sovereign court of Montpellier, great facilities to those who seek to obtain the liberalities of a mad or insane man.
His serene highness the Chancellor of the empire observed that proof was not to be so restricted as to exclude evidence. The party, said he, may have preserved a sound mind, till a period very near that of the donation or will ; and then it becomes impossible to prove the insanity. He concluded it would be best to leave the matter to the courts.
We would cheerfully join in this opinion. It is difficult to establish precise rules, in cases which depend upon facts, and it may be dangerous to hold out facilities to intrigue and bad faith. It seems nevertheless that the silence of the law, in this title, does not allow a deviation from the articles 503 and 504. Some one (probably Emery, in the discussion in the council of state) has said that they do not relate either to donations or testaments ; but it suffices to read them, in order to be convinced that they extend to every act whatever.
Delvincourt, in his Cours du Code Napoleon, 710, says : the opinion that the 504th article is not applicable to donations or testaments is grounded on two reasons. The one, that if it was, the 901st would be absolutely useless : the other, that in the *584 projet du Code a paragraph had been added to the 901st article, which referred to the 504th, and in the discussion this paragraph was suppressed. It seems to me that it may be observed, on the latter reason, that it does not appear that the paragraph was rejected, but only adjourned till the reconsideration of the 504th article, which was to have taken place, but did not. To contend that a distinction is to be made between acts on an onerous and those on a gratuitous title, and that the 504th article does not extend to the last, appears to me an opinion which cannot be reconciled with the text, which makes no distinction, and with reason, which seems to dictate that it is principally to the latter that the article is applicable, as they are those which heirs have the most interest to avoid and which are consequently to be protected against their avidity.
Masse, in his Parfait Notaire, published in Paris in 1813, three years after the decree of the court of cassation, cited by the defendants’ counsel, a decree which must have been known to him, not only on account of the important point it decided, but on account of the nature of the action in which it was rendered, as I will shew by and by, observes : there are four kinds of incapacities common to donors and testators. He, who is not of sound *585 mind, cannot dispose by donation inter vivos nor by testament, Code Nap. 901, so, an insane person cannot dispose on a gratuitous title ; nevertheless, after his death, the disposition cannot be attacked, on this score, if the interdiction of the donor or testator was not pronounced or provoked, before his death, unless the proof of insanity should result from the act which is attacked, as if it contain foolish dispositions.
Sanity of mind, if that expression may be used, is undoubtedly necessary to the donor or testator. By it we mean the state of a mind neither agitated or troubled, master of itself, as far as human passion allow. As in speaking of the body we cannot say that one is sick, unless a strong fever or other violent sickness exist : speaking of the mind, it would be absurd to say that its sanity is lost, when the mind is not agitated by madness or its functions prevented by imbecility.
It cannot be holden that a man is incapacitated from making a disposition of his property because his mind is less settled or weeker than that of an ordinary man, while he preserves that understanding which is required for the conduct of ordinary affairs and the discharge of common duties.
If in order to pronounce on the validity of a will a stricter inquiry was requisite, lawyers alone could not pronounce thereon , the aid of physicians and philosophers would become necessary.
*587 Calange observes that in the project of the Code Napoleon, a paragraph was added to the 901st article which provided that these acts should not be attacked, &c. That it was observed it presented a too general proposition ; that insanity is a fact, to which the genenal rules of evidence apply ; that relations, relying on the return of the party’s sanity, delayed to solicit his interdiction ; that the testator might have preserved his health of mind until a few moments before his death ; that more latitude was to be left to courts, and parol evidence ought to be admitted when there is a beginning of proof in writing.
Are we to conclude, says he, that the 504th article is not applicable to donations and testaments, and that after the death of a donor or testator, the sanity of his mind may be questioned, when his interdiction was not provoked before and no proof of insanity resulted from the deed of gift or testament? The 504th article is imperative, has received no modification, its disposition is general and was made so, with a view to donors and testators chieflly. 12 Nouveau Denisart, 668.
The jurists, who have reduced to a regular order, the result of the discussions of the Napoleon Code in the council of state, atending to the plan given *588 them by the minister, observe on the 901st article, that it contains only one of the plainest and general principles of natural reason and could afford no matter for discussion.
A donor or testator is of right inferred to be of sound mind unless the act itself offers some evidence of the contrary : otherwise the party who endeavours to set aside the disposition will not be attended to, after the death of the donor or testator, whose interdiction he neglected to provoke.
The same principle is found in 2 Pigeau, 86.
The 503d article of the Napoleon Code proves that acts anterior to the interdiction may be set aside, if the cause of the interdiction notoriously existed at the time such acts were made, and this disposition, evidently extending to donations and testaments, shews that the testament of one who dies in a state of interdiction remains valid, if the cause of the interdiction is not shown to have existed at the time it was made. 2 Questions transitoires sur le Code Napoleon, 440.
In support of these respectable and conclusive authorities, I have met with four solemn decisions 3, Sirey, p. 273, part 2; 5, ib. p. 209, part 2; 16, ib. p. 233, part 2 ; Jur. du Code Nap. vol. 1, p. 305.
In one of these, the heirs who attacked the testa *589 ment, contended, that insanity is often produced by a violent paroxism, so that when a person, attending a sick man, avails himself of the temporary alienation of his mind, in a moment of delirium, to obtain a donation or will, it cannot be expected that the interdiction of the donor or testator be provoked, so as to prevent the party enjoying the fruit of his covetousness. The friends of the sick person may be ignorant of the circumstance. Who is the son, who will provoke the interdiction of a parent, because the paroxysm of a fever has momentarily deprived him of the use of his mental faculties ?
They took notice that, in the discussion which took place in the council of state, it was asked whether the nullity of a testament, could not be pronounced, on account of the insanity of the testator, when the interdiction of the testator was not provoked, when it was answered (and it will be recollected that the observation was made by Mr. Emmery) that the dispositions of the article 504 were not applicable to testaments. These observations, which the defendants’ counsel uses in the present case, did not prevent the court of appeal from declaring that according to the 504th article of the Napoleon Code, after the death of an indi *590 vidual, none of his acts can be attacked on the score of his insanity, unless the proof resulted from the act itself.
The defendants’ counsel has stated that the principle he contends for, is supported by the most enlightened and the most illustrious jurists of France. He has however cited Merlin alone. For we cannot do him the injustice to imagine that he classes Paillet among these jurists. This writer being only known as the editor of a Code Civil with notes.
The counsel has joined together two notes of Paillet, which are absolutely unconnected in his work. The first is entirely without any bearing on the question before the court, since the date of Avart’s testament is posterior to the code. As to the second, I have to observe that the case referred to is the same as that in which the decree of the court of cassation cited was rendered.
I have sought in vain, in the place indicated by the defendants’ counsel, what he says he has found, viz : that the second part of the 901st article was rejected, and this on the observations made by Cambaceres, or because “ the will of him who disposes ought to be certain : and this will cannot even exist, if he be not of sound mind. It has been sufficient to state only the general principle (in order *591 to make a donation inter vivos or a testament one must be of sound mind) in order to leave to judges the utmost latitude, in its application.”
I admit, I cannot comprehend how the defendants’ counsel has been able to find, in these last expressions, the motive for the rejection of this second part, and I cannot conceive how he could advance that it was rejected, when at the end of the discussion of the 901st article, with which he has favored us, we read, in the two lines which follow the observations of Emmery, that the 504th article relates neither to donations nor testaments, these remarkable words which cannot have escaped the notice of the counsel, “ the first part of the article was adopted, the second adjourned, till after a new examination of the 504th article.”
To show in what point of view the decree of the court of cassation, cited by the defendants’ counsel, and the principle on which it is grounded, were looked upon even in France, let me submit to the court the very sound and learned observations of M. Cotelle, L. L. D. and law professor in the faculty of Paris, in his much celebrated work 1, Cours de droit Francais, p. 320, § 1.
“Of the incapacity relative to the state of mind *592 or the donor or testator, and or the condition of being of sound mind.
The interpreters of the code have often fallen into a great inconvenience, that of seing in the code only new dispositions, and of thus detaching them from our ancient jurisprudence, for the purpose of explaining the code by new and particular considerations, which are no where else to be found. It would appear that these interpreters do not perceive that such an isolated mode of proceeding, tends to destroy the progress, which our jurisprudence had already made ; that they are retrograding in the science, and plunging into such a course of arbitrary decisions that ages will be requisite to recover the elements of a sound, and above all, a constant and uniform jurisprudence. This should be a subject of reflection especially to those who unite with this pernicious facility, a great fund of legal knowledge. From some of the simple expressions, which escaped from those who cooperated in the discussions of the code, maxims have been drawn of which these persons had no idea whatever ; (This remark evidently applies to what M. Emery has said in the discussion of the article 901,) the mere placing of certain legal dispositions, under a title different from that which usually announced the principles ex *593 pressed in those dispositions, appears to have favored this system of innovation.
I shall be excused for this reflection, if I find here a just occasion to apply it ; it is in the use which is made of the 504th article of the code.
This article only expressed a general rule, known in the ancient jurisprudence, and which served as a corrective of the abuse which might be made of the maxim, written in all our local laws, (coutumes) that in order to give or to devise the donor or testator must be of sound mind.
This maxim, reproduced by the article 504, was that at the death of an individual, the acts done by him may be attacked for cause of insanity, only when his interdiction has been legally pronounced or demanded before his decease, unless the proof of the insanity should result from the very act which is attacked.
All the difficulty, which has been raised upon this article, consists in this, that being placed in the chapter concerning interdiction, it has not been repeated in the chapter on donations, where the other maxim forming the article 901 has been placed, to wit: that he who makes a donation or a will must be sound of mind. From hence it has been concluded that the article 504 relates solely to acts *594 on an onerous title and not to donations and wills, against which it is pretended that the allegation of insanity ought always to be indistinctly admitted in proof.
This is the doctrine which we find in the treatise on donations and wills, part 1, ch. 3, § 2. There this disposition is considered as having no relation whatever with the article 901 ; it is there considered that this disposition of the article 504 applies principally to the ordinary acts of life, such as acts on an onerous title, and to an habitual state of madness very different from that contemplated by the article 901 ; that if the legislator intended that this article 504 should also relate to gratuitous dispositions, he would have explained himself to that effect in the title on donations and wills, and that he could not have said in a different manner, in that title, that it was necessary to be of sound mind.
That which gives an imposing weight to this doctrine is the support which the author of that work finds in the decree of the court of cassation of the 22d November, 1810, which he cites, (this is also the decree wherein the defendants' counsel has intrenched himself and where he believes himself to be invincible. Probably, if Grenier, the author to whom Cotelle alludes here, had written *595 before the decree, his doctrine would be quite the reverse) which decree rendered upon the conclusions of the attorney general has confirmed almost litteraly his doctrine.
We may even remark the absolute and indefinite terms in which this decree declares, in the motives assigned for the rejection of the appeal, (pourvoi:) that notwithstanding the article 1341, 1347, 1352 and 1353 of the code it is permitted to parties to alledge and to the tribunals to admit them, (here a specimen of the latitude, the courts in France have or take for themselves) to prove all the facts of a nature fit to establish that the author of a donation or of a will was not of sound mind, at the time of making those acts, without distinguishing whether those facts did or did not constitute a permanent state of madness.
In fine it is further shown that this decree is only the result of the doctrine contained in the new repertory of jurisprudence under the word testament. (It is to be observed that the volume, containing this doctrine of Merlin, was published, in 1809, one year after the judgment of the court of Poitiers.)
Far it be from me to refuse the homage due to the court of cassation, whether considered as the first of the bodies of sovereign magistracy, to which *596 the law itself confides its interests and the care of its interpretation ; or the first luminary which shines in the midst of us on all the subjects of our jurisprudence.
I know well the great number of men deeply learned, and religiously attached to the study of reconciling the genius and the spirit of the laws with the great interests which are entrusted to them, by which this tribunal is composed.
I am not less inclined to a great respect for the talents and opinions of the first of magistrates (who are as it were the eye of the law) who has personally left traces so extensive and profound of his progress in the study of jurisprudence.
But if every thing has not been said on this point ; if even in the great exactness which this decision might in itself possess it has really gone too far ; in a word if some rays of light may yet be employed to confirm that decision or to conduct us in its consequences, I may be permitted to examine the grounds upon which this jurisprudence rests and above all to inquire whether it is not, taken in its full extent, the useless and dangerous subversion of a just, enlightened and reasonable jurisprudence which has hitherto prevailed.
(The author having devoted several pages to the *597 examination of the principles of the ancient jurisprudence by which France was governed, concludes thus, page 326.)
It appears then that the makers of the code have inserted in it the article 504 only in order to preserve that jurisprudence with which they were familiar, as well as that relative to ordinary acts and on an onerous title, attacked in the same circumstances and for the same causes.
How then comes it to be said that this disposition is restrained to acts on an onerous title ? It is evident that, on the contrary, the acts of liberality have afforded more frequent occasions of puting this point in question.
The reason drawn from this, that the article 901 states in general terms that it is necessary to be of sound mind without repeating the dispositions of the article 504, is of no weight. For in as much as this exception was already written that was a sufficient reason for not repeating it.
And moreover the article 504 is not relative to that general proposition, but only to the use of attacking the condition of a person who might and ought to be interdicted ; and this makes no change in the rule, that to dispose of property it is necessary to be of sound mind.
*598 This rule was found in the greatest part of the coutumes, and it is nothing else but a general rule of law from which has resulted the rule of jurisprudence contained in the article 504.
To conclude, this article is placed there among other dispositions which regulate the condition of persons (the corresponding article of our code is in like manner placed among the same dispositions ;) it is there in order to be applied to all acts without distinction where the condition of the person may be made a ground for contesting the validity of his act.”
According to the authorities which I have cited, it is then incorrect to say that in France the intention of the legislator was not that the 504th article of the Code Napoleon should extend to donation causa mortis or testaments, as it does to ordinary acts. The defendants’ counsel urges that, with the exception of a judgment of a court of appeals, shortly after the promulgation of the Code, the decisions of all the sovereign courts of France and particularly that of the court of cassation have sanctioned the principle for which he contends. I have sought with care in the jurisprudence du Code Civil, in Denevers and Sirey, which are the most complete collections of the decisions of the sovereign courts *599 of France, and I have discovered only the two decrees cited by the defendants’ counsel ; when I have found four in support of the principle which I contend for, and on which I shall draw the attention of the court hereafter. True it is that three out of those four, are anterior to the decree of the court of cassation and were rendered shortly after the promulgation of the French Code ; but to urge that these decisions are not correct, because they were given only a short time subsequent to the decision and promulgation of the code, would be going against what the experience of all ages and countries has constantly taught, to wit : that the less time which has elapsed since a thing took place, the better we are acquainted with it.
But let us fix our attention on the decree of the Court of Cassation, of the 22d of Nov. 1810, confirming the judgment of the Court de Poitiers of May 27, 1808, on both of which the defendants' counsel relies with so much confidence.
Surprised at finding a decree of the court of cassation, in direct opposition to the doctrine, which had prevailed till then, I have carefully examined all the circumstances of the case in which it was rendered and I find them to be these :
Marie Jacob was the wife of Francis Jalet,a pur *600 chaser of national property, of the first and second origin, that is to say of property of the church and of property of emigrants. Her conscience not being perfectly at rest on the score of the legality of these purchases, on the last complementary day of the ninth year, she made her last will before two notaries. She began by devising in full property and for ever the portion which might belong to her, of the property of emigrants, purchased or to be purchased by her husband, to the former proprietors, if they were returned and erased from the list of emigrants, and capable of taking by devise, otherwise to such persons as were legally able to inherit their estates, in the direct or collateral line, who might enter thereon, at her death, and possess the same as such property should be, except the carts, cattle and seeds, which should go to her heirs.
By the last clause she devised to the hospital of incurable patients of Poitiers, the portion which might belong to her of national estates, proceeding from the property of the church.
Now the particular circumstances of this case easily account for a decision so much at variance with the former ones and the doctrine till then universally professed. National property was the subject of the suit and we all know how much that *601 kind of property kept the French people in alarm. The cause was a popular one. Judges in France have a great latitude of powers, and never did a case more loudly call for an arbitrary decision.
Let us compare this judgment with that of the court of appeals of Paris, of the 26th of May, 1815, 16 Sirey, 285, Part. 2. Let us consider with what severity of principles the judges in the later case rejected the proof which was offered them of the marked insanity (long before the testament) of a man who had disposed of a considerable part of his property, in favour of strangers, such as old friends, lawyers, his secretary, his valet de chambre and other servants, to the prejudice of his daughters : and let us say whether precedents may be safely sought for, in the decisions of the courts of a country, in which judges may torture the law and bend it at their will.
That no written proof of any kind whatever could be shown of Avart’s not being of sound mind during the time he dictated and made his will, is a proposition too dear, too self-evident to be demonstrated. By the very nature of things, no such written proof can possibly exist, unless the will itself, from beginning to end, be a forgery of the notary *602 and witnesses, and in this case, it is on the score of forgery that it ought to be attacked.
Parol evidence of the insanity of the testator is then the only one which can have been adduced, and it ought to have been rejected, as prohibited by our statute which forbids the admission of parol evidence beyond or against the contents of an act.
The rule, according to which testimonial proof of the insanity of a testator is admitted in France, is grounded on the principle that as the notary and witnesses attest the actual, and not the habitual state of the testator’s mind, that proof does not tend to contradict the act.
Invoking the same principle, which appears perfectly correct, and adapting it to our practice, would not the testimony contradict a testament made in this state, if while the notary and witnesses have born testimony to the sanity of the testator’s mind at the time he made his will, witnesses were heard to declare that he was, at that very time, insane ?
In France, they say the notary may not have noticed the insanity of the testator, whom he may have found in a state of apparent sanity, (and this is what, among us, constitutes a lucid interval) that the time employed in receiving the will may be too short to enable him to judge of the habitual state of the tes *603 tator, whose dispositions, whatever may be his situation, may appear perfectly wise ; and that, because the notary may have been deceived in supposing the habitual state of the testator’s mind to be what it appears at the time, courts ought to hear witnesses (using the very expressions of the decree of the court of cassation relied upon by the defendants' counsel) in order “to prove the facts which are of a nature to establish that the author of a donation or of a will was not of sound mind, at the epoch those acts were made, without distinguishing whether those facts did or did not constitute a permanent state of insanity.”
In the case under the consideration of this court, the will contains the attestation of the notary and three witnesses, that the testator was of sound mind. They, alone, could judge of the actual state of his mind, and no subsequent evidence, oral or writen, can destroy that which thus results from the instrument. An allegation of insanity would tend to shew that the will, wise in itself, was suggested to the testator, or is a feigned one, which suposes, not an erroneous judgment in the notary, but an actual forgery. For it cannot be conceived that an insane man whilst labouring under the pressure of his disease, might dictate long and complicated dis *604 positions, which bear the stamp of sound reason.
Let us now examine the positive and unabrogated law which the defendants’ counsel believes to have found in the Partidas, requiring that the testator should himself express the state of his mind and understanding, and that the notary should relate what the testator has said, and should write the will from beginning to end, making the testator always speak in the first person of the indicative present.
The will of Domingo Trujillo, received on the 18th of May 1763, by Joseph Fernandez, an ancient Spanish notary, begins thus, “ Be it known that I, D. T. being very sick, but in my entire judment, memory and understanding, &’c. and concludes” and I, the notary, do attest that I know the *605 testator, who, according to appearances, is in his entire judgment and complete memory, &c.
The will of Carlos Cout, received by Almonaster, on the 17th July 1771, contains precisely the same expressions.
So does that of Anna Rafleans, received by the same notary, on the 19th of March 1780.
So does that of Antonio Gonzales, received by Carlos Ximenes, on the 28th of March 1798.
It is true that we would look in vain in the Spanish law, for a disposition, imposing on notaries the obligation of attesting the state of the testator’s mind ; but we have works of Spanish jurists in which they detail the duties of notaries and give forms of the different instruments executed before them.
In the form of a codicil, 1 Febrero, 216, the notary attests that the testator is en su entero juicio *606 altho’ in the form given in the Partidas, no mention be made of this circumstance, either by the notary or testator.
Carlos Ros, in his work on the duties of notaries vol. 2, 53, gives the following form of a will, “In the name, &c. be it known that, &c. being in perfect health, full judgment, memory, and natural understanding, and with such a disposal of my senses and faculties, that it appears to the notary and witnesses underwritten that I may indubitably dispose of my property and make my testament, which the notary certifies.”
The authors, last cited, give other forms in which the like mention is made.
If according to Partida 3, 18, 103, which contains the form of a testament, the notary is bound to make the testator speak in the first person, in a will, the rule must be the same for a codicil. Yet we see that altho’ the Partida 3, 18, 104, has the form of a codicil, in which the testator speaks in *607 the first person, Febrero, in the form of a codicil which he gives, makes him speak in the third.
Surely, if Febrero had thought that the forms , given in the partidas were like those stolen and published by Cnœus Flavius, which were so rigorously to be followed that the least deviation caused the nullity of the act, he should have scrupulously followed them. Let the forms given by Febrero be compared with those in the partidas and we will be convinced how erroneous is the idea that the latter are to be literally followed.
I think it necessary to repeat what I have said in the beginning of this case, that the single instance in which holds the doctrine of Febrero, that para anular el testamento del loco que tiene intervalos lucidos es menester probar concluyentemente que lo estaba y no los tenia, is when the notary has been silent on the state of the testator’s mind, either because he was not sure of it, or on any other account. I will refer here to the only form of a will given by Febrero, in which nothing is said by the notary of the state of mind of the testator, and to the will of Carlos Quiroga, received on the 28th of November, 1770 by A. Almonaster, who was in the habit of attesting the state of the testator’s mind and who, nevertheless, in this instance, did not do so.
The notary, who received Avart’s will and who has the honour of exercising the profession of counsellor at law, was penetrated with the truth and the sanctity of these principles. He knew that he could not be heard, as a witness, concerning the will he had thus received. Even, in case he had not been engaged as counsel in support of it, strong in the testimony of his own conscience, jealous of maintaining an unimpeached reputation, he would have taken the same pains to uphold the validity of dispositions, which he has the most certain conviction were dictated to him, by a man in the perfect exercise of his moral and intellectual faculties.
The defendants’ counsel has not well understood the law to which he refers, forbidding counsel being sworn in their clients’ causes. Let him examine that law, 1 Martin's Digest, 504, and let him recollect that in many instances our courts of justice *610 have declared, under that law, and that of Partida 3, 16, 20, which says : Bozero non puede ser testigo del pleyto que el oviese comenzado a razonar. Pero si la parte contra quien razonase lo pidiese por testigo, entonce lo podria ser, that a party is permitted to require the testimony of the opposite party’s counsel ; and he will then be convinced that the defendants, notwithstanding the circumstance of the notary’s being the plaintiff’s counsel, had it in their power to make the proof, as required by Febrero ;—supposing always that the article 16, p. 80, of our code and the attestation, in the will, by the notary and witnesses, of the testator’s being sound of mind, did not, either and both, absolutely oppose such a proof. Let it not be said any more, then, that the notary could not be heard as a witness, because he had permitted himself to be engaged as counsel.
It is asserted by the counsel of the defendants that “since the promulgation of our code, notwithstanding the provision that no parol evidence is to be admitted against or beyond the contents of an act, witnesses have been heard in order to set aside a will in which it was falsely mentioned that formalities of the substance of the will had been accurately complied with,” and, in order to give, some *611 weight to this assertion, he refers to the case of Knight vs. Smith, 3 Martin, 156. This manner of relying on a precedent is quite new to me. I have examined with a scrupulous attention the case cited and found that a last will has been declared void on the two following grounds, to wit : 1. it had not been written by the notary himself as. the law requires, and 2. one of the persons mentioned in the body of the instrument as a witness, was not present when the will was dictated, not when it was read. But I did, not find, that the will falsely mentioned that it was written by the notary and that all the witnesses were present, when it was dictated or when it was read. Supposing even, that the will falsely mentioned these circumstances, this court having not given any opinion on the point, I do not see how the defendants’ counsel could rely on this case to support his opinion, which is not only in direct opposition with the doctrine professed by Merlin, d’Aguesseau and the court of cassation, which he cites, but not supported at all by the passage of Febrero which he quotes. This author, after mentioning the requisites of the witnesses to a will, continues thus : ante los guales (testigos) y el escribano juntos, ha de manifestar el testador verbal, clara y distintamente su voluntad, de suerte que to *612 dos a un mismo tiempo la entiendan, y en caso de duda puedan deponer contextes, siendo sobre ella interrogados. Ella most evidently refers to voluntad. Is it not dear, then, that what is thus required from the notary and witnesses, is in order that if there be any doubt concerning the intention expressed by the testator, his voluntad, they may declare contextes, (that is to say, each making the same deposition as the others) in order to explain, not to contradict, that voluntad ?
Let us notice the jurisprudence of Spain as it existed here before the adoption of the civil code, with reference to the mode of proof of the insanity of a testator at the time a will was made.
Either the notary and witnesses were silent on this point, or the fact was attested by the notary alone, or by him and the witnesses.
The first case is that to which is applicable Febrero’s doctrine, that the testimony of the notary and witnesses ought to be heard.
In the second, if the witnesses deposed against the sanity of the testator, the rule in Partida 3, 18, 117, was followed. Si el (escribano) otorgase que verdad era que escribiera (la carta) y los testigos que fuesen escritos en ella, dixesen que non se acertaron y, quando el pleyto fue puesto nin otorgado *613 de las partes asi como es escrito en ella ; estonces decimos, que si el escribano es ome de buena fama y fallara en la nota que es escrita en el registro, que acuerda con la carta, que debe ser creido el escribano y no los testigos. This doctrine was sanctioned by this court, 5 Martin ; 405, Langlish vs. Schons & al.
Though I feel confident that the court will pronounce that the article 16, p, 80 of our code applies to all acts, and that no proof being given of Avart’s interdiction having been demanded or obtained before his decease, his will must be maintained, I will add a few observations in answer to the arguments used by the defendants’ counsel in order to prove that the new trial was rightly refused.
The statute concerning new trials, cited by the defendants’ counsel, does not make it any more a duty to the client to search for evidence than to the attorney, and does not require in the least that a party, applying for a new trial, should swear that he was ignorant of the newly discovered evidence, any more than that he has neglected nothing to procure it. We must not lend to the law a language which it has not made use of. This is the wording of the statute : whenever new evidence material to the cause shall have been discovered, after the trial, which the party could not by reasonable diligence have discovered before—the court, on the application of the party injured, may grant a new trial.
These plain expressions of the law show how unlucky the defendants’ counsel has been in the choice of the case of partners, as the ground of his argument, pretending that it would not be sufficient that one of them should be within the words and *615 spirit of the statute to obtain a new trial, because it would not follow that the other partner was uninformed of the new evidence. If the partner is a party to the suit, if he be injured by the judgment, and if he can swear to newly discovered vidence, what court of justice would refuse the new trial on the ground that the other partner may have been apprised of this evidence ? Because one partner chooses to give up his rights, is it a reason that his copartner should suffer by it ? No, there is a maxim of law, which Pothier calls generalissima regula, which says : non debet alteri per alterum iniqua conditio inferri, 1. 74, ff. de reg. jur. from which flows the doctrine which we see established in 1. 39, ff. neg. gest. naturalis enim, simul et civilis ratio suasit, alienam conditionem meliorem quidem etiam ignorantis et inviti nos facere posse ; deteriorem non posse.
As our manner of proceeding in matters of new trial is borrowed from the common law practice, prudence, wisdom and modesty require that we should consult common law decisions rendered by men whom we must suppose better informed than us in that part. In 8 Johnson 489, in the case of Jackson vs. Laird, we see that: the verdict being found for the plaintiff, a motion is made in behalf of the defendant for a new trial on the ground of new and material evi *616 dence. Cornwell, to whom the defendant had abandoned the defence of the suit, in his affidavit, swore that though Fink was a witness at the trial of the cause, yet he did not know Fink knew or could testify
any thing material in the cause, until after the trial. But it appears that the defendant, who was not however present at the trial, knew before the trial what Fink could testify. Per Curiam. The testimony of Fink is material ; it is true that Fink was present at the trial and that the defendant knew beforehand what he could prove. But the defendant was not present at the trial and Cornwell, to whom he had abandoned the defense, swears, that he knew nothing of this testimony until after the trial. The motion for a new trial is therefore granted.
Under the Part. 3, 5, 4, which, in favour of liberty, not only permits to a slave to appear in court for the recovery of his freedom, but authorises any one, whether a relation to the slave or a stranger, to act in his behalf, though without any mandate to that effect, Marie has entrusted to me the care of prosecuting her rights, she has abandoned to me the defence of her cause. From the moment I accepted of the charge, I became her personero, and from the moment the issue was joined, I was authorised by law to act in her name and to do in her *617 behalf, even in case she should die, all that she could personally do, till the final decision of the suit. Part, 3, 5, 23, sanctioned by a decision of this court, 4 Martin, 486, Montreuil vs. Lumonville.
To the case, which the defendants’ counsel boldly maintains is the only one in which the party’s own affidavit may be dispensed with, to wit : “when he is absent,” I think we can add those of a father, of a husband, of a tutor, of a testamentary executor, of a copartner, of a colitigant, of a personero, & c. ?
The defendants’ counsel calis into question that this court can take cognizance of the denial of a new trial by an inferior court. This point has been already wisely settled in the case of Sorrel vs. St. Juhen, 4 Martin 508, “The nature of the discretion of the courts below (said the learned and upright judge who delivered the opinion of the court in that case) in granting and denying new trials, is not an arbitrary but a sound, legal and judicial discretion, to be guided by fixed principles and subject to the revision of this court.” In an other passage of the same opinion, we read these precious and comforting words : this court will relieve on the improper denial of a new trial, when thereby the party sustains an irreparable injury.
That my client has sustained an irreparable in *618 jury, is self-evident. The new trial has been denied to her, contrary to the justice of her cause and the favour which the laws of all civilized nations show to persons suing for freedom, especially our local laws and those of the other states of the Union. (For examples of the favour shewn by the courts of the sister states to paupers suing for freedom, see in Hudgins vs. Wright, 1 Hening and Munford, 134 and Isaac vs. Johnson, 5 Munford, 95.) Her cause is one of the most favourable in the eyes, I will not say of humanity, but of strict justice ; it embraces the interests of a woman and of a child for whom all the laws grounded, like those which govern us, on the immutable principles of natural equity, show the most tenderness, especially when, as in this case, they sue for freedom, speaking of which, Part. 18, 22, 3, says : todas las leyes la deben ayudar, quando ovieren alguna carrera, ó alguna razon por que lo puedan fazer. Under this consideration, and this consideration alone, the new trial ought not to have been refused.
New authorities being introduced in the reply, the defendants’ counsel had leave to answer them, at next term.